No. 88-109

IN THE SUPREME COURT OF THE STATE OF MONTANA

1988

---

IN RE THE VISITATION OF
NEOLA B. KANVICK AND JOHN R. KANVICK,

       Petitioners and Appellants,

   -vs-

DEBRA H. REILLY,

       Respondent.

---

APPEAL FROM:  District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable Peter L. Rapkoch, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Harris & Seidler; Nancy C. Seidler, Billings, Montana

    For Respondent:

        Dunaway, O'Connor & Moe; William J. O'Connor, II,
Billings, Montana

---

Submitted on Briefs:  June 30, 1988

Decided:  August 22, 1988

Filed: AUG 2 2 1988

*Ethel M. Harrison*

---

Clerk

Mr. Justice William E. Hunt, Sr., delivered the Opinion of the Court.

Neola B. and John R. Kanvick appeal an order of the District Court, Thirteenth Judicial District, Yellowstone County, denying their petition for a right to visit their granddaughter.

We affirm.

The issues on appeal can be framed as follows:

1. Did the District Court have the authority to entertain a petition in a custody action for visitation of a grandchild by the natural paternal grandparents?

2. Did the District Court err when it considered evidence of sexual abuse by the natural father?

3. Did the District Court abuse its discretion in concluding that unsupervised visitation by the natural paternal grandparents was not in the best interest of the grandchild?

Debra H. Reilly, respondent, and Glenn R. Kanvick, appellants' son, were granted a decree dated March 4, 1983 dissolving their marriage. During the marriage, they had one minor child, K.R., whom the court placed in the mother's custody. The mother later remarried. The appellants (Kanvicks) enjoyed regular and unsupervised visits with K.R. until approximately July, 1985. At that time, the mother would only allow visits in her home.

On January 24, 1986, the Kanvicks filed a petition for visitation requesting the court to order that K.R. be allowed overnight stays each month and day visits each month and holidays. In a separate adoption proceeding brought by K.R.'s new stepfather, Glenn Kanvick's parental rights were terminated and the stepfather was allowed to proceed with his

adoption of K.R. without the father's consent. The adoption was granted May 2, 1986. On February 11, 1987, a hearing was held on the Kanvicks' petition. The court denied the petition by order dated November 17, 1987.

The respondent mother has raised the issue of whether the District Court had the jurisdiction to adjudicate the question of grandparents' visitation rights after K.R. had been adopted by her stepfather. This is a question of first impression in Montana that must be treated with the utmost care and consideration as it involves relationships between and the rights of the natural and adopting parents of a child.

The focus here is on the interplay between two statutes. The first is § 40-9-102, MCA, which allows the District Court to grant grandparents reasonable visitation. It reads in pertinent part:

> (1) Except as provided in subsection (5), the district court may grant to a grandparent of a child reasonable visitation rights.
>
> (2) Visitation rights granted under this section may be granted only upon a finding by the court, after a hearing, that the visitation would be in the best interest of the child.
>
> . . .
>
> (5) This section does not apply if the child has been adopted by a person other than a stepparent or a grandparent. Visitation rights granted under this section terminate upon the adoption of the child by a person other than a stepparent or a grandparent.

In apparent conflict with the above statute is the statute concerning the final effect of an adoption decree, § 40-8-125, MCA. The relevant section of this statute reads:

> (2) After a final decree of adoption is entered, the natural parents and the kindred of the natural

parents of the adopted child, unless they are the adoptive parents or the spouse of an adoptive parent, shall be relieved of all parental responsibilities for said child and have no rights over such adopted child or to his property by descent and distribution. (Emphasis added.)

We must resolve the apparent conflict between § 40-9-102(2), which gives grandparents visitation rights if it is in the best interest of the child, and § 40-8-125(2), which appears to abrogate those rights upon adoption. Because this Court has not decided this narrow issue we seek guidance from other jurisdictions.

Under the common law, grandparents had no right to visit their grandchildren without parental consent. Ex parte Bronstein (Ala. 1983), 434 So.2d 780, 782. The majority of courts have generally adhered to this rule especially when faced with a situation where the child has been adopted. See Matter of W.E.G. (Alaska 1985), 710 P.2d 410; In re Adoption of Schumacher (Ill.App. 1983), 458 N.E.2d 94; Bronstein; Mead v. Owens (Ga.App. 1979), 254 S.E.2d 431.

The rationale behind this position is best summed up in Schumacher:

> The majority view is persuasive, as there is no indication that the Illinois statutory provisions for grandparent visitation were intended to override the adoption laws.. . . However, as a grandparent's status as such is derived from the relationship between the child and the natural parent (In re Adoption of Gardiner (Iowa 1980), 287 N.W.2d 555; see People ex rel. Bachleda v. Dean (1971), 481 Ill.2d 16, 268 N.E.2d 11), an adoption, which terminates the rights of the natural parent, also removes the basis for the relationship of the grandparent and thereby ends the status on which the statutory right to visitation rests. (In re Adoption of Gardiner (Iowa 1980), 287 N.W.2d 555.) Further, the mere existence of a statute permitting court-ordered grandparent visitation under certain circumstances should not be allowed to defeat the adoption statute's basic premise of the complete

- 4 -

severance of ties between the child and the natural family. (See 287 N.W.2d 555; Browning v. Tarwater (1974), 215 Kan. 501, 524 P.2d 1135.) Therefore, the grandparent visitation provision should be construed as subject to the adoption laws, such that a completed adoption proceeding supercedes any rights which could have been obtained pursuant to section 607(b) of the Illinois Marriage and Dissolution of Marriage Act (Ill.Rev.Stat. 1981, ch. 40, par. 607(b)). See In re Adoption of Gardiner (Iowa 1980), 287 N.W.2d 555; Browning v. Tarwater (1974), 215 Kan. 501, 524 P.2d 1135; see also Bikos v. Nobliski (1979), 88 Mich.App. 157, 276 N.W.2d 541.

458 P.2d at 97-98.

While this is the majority view, there are indications that even the majority recognizes the harshness that may result. Judge Shulman of the Georgia Court of Appeals, concurring specially in Mead, stated:

I must agree with the legal premise set forth in the opinion in this case. However, I feel compelled to raise a voice in the hope that in a more enlightened time, the strong and natural love that grandparents have for their grandchildren will be recognized to a greater extent and that their rights to implement that affection will be legally enlarged.

254 S.E.2d at 432.

Similarly, Alabama Supreme Court Justice Shores stated, specially concurring in Bronstein:

I agree that the common law does not recognize, and never has, any right of visitation by grandparents. I hope, however, that the Legislature will address this issue and pass legislation extending to grantparents a right to retain and maintain a relationship with the children of their children. Precious little remains of the family structure, which played such a vital part in the development of this nation. It seems unconscionable to allow its further fragmentation.

434 So.2d at 784.

Accordingly, many states are taking a less stringent approach in harmonizing their adoption and grandparent visitation schemes.

One of the earliest cases which does this is Mimkon v. Ford (N.J. 1975), 332 A.2d 199, in which the New Jersey Supreme Court held that the grandparent visitation statute created an independent action in the grandparents and therefore their rights were in no way dependent upon nor derived from the natural parent's relationship with the child. 332 A.2d at 201-02. By reading the adoption statute and visitation statutes in pari materia, the court distinguished between situations where the adoptive parents were non-relatives or strangers to the child and where the adoption was done by a natural parent and step parent couple. In the adopting step parent scenario, reasoned the court, "the policy of insulating the adoptive child from his natural parents is not so clearly compelling as it would be in other situations." Mimkon, 332 A.2d at 203.

Illinois takes a concomitant view:

In adoptions by a natural parent and that parent's new spouse, the policy concern with maximizing the pool of adoptive parents is greatly diminished, since the act of becoming a stepparent most often occurs without regard to adoption and in spite of regular visitations between the child and the noncustodial natural parent. If an adoption then ensues, the rights and obligations of the natural parent are terminated to the same degree as in an adoption by strangers. Termination of the parental relationship is, however, a legal fiction, since no act of law can nullify a biological relationship. There is no reason to extend that legal fiction to include a termination of a grandparental relationship unless it is in the child's best interest to do so.. . . Absent an adoption of an infant by strangers, there is no reason to assume from the outset that termination of a grandparental relationship is in an adopted child's best

- 6 -

> interest; nor is there any reason to view grandparental visitation as an "unnecessary intrusion" in the lives of a reconstituted family.

Lingwall v. Hoener (Ill. 1985), 483 N.E.2d 512, 516.

This Court finds the reasoning of the Lingwall case persuasive and adopts that view. Section 40-9-102, MCA, gives a clear indication of intending to differentiate between situations where adoption is done by strangers and where it is not. Subsection (5) states succinctly that any rights obtained under subsection (1) are terminated upon adoption of the child by anyone other than a stepparent or grandparent, i.e., a stranger or relative further removed from the immediate family unit. While Montana law does not permit visitation by a natural parent whose child has been adopted, Matter of C. P. (Mont. 1986), 717 P.2d 1093, 1095, 43 St.Rep. 728, 731, we see no clear intent of the legislature nor a public policy which mandates a similar result for the natural grandparents of that child where the adoption is done by a stepparent. Therefore, we hold that the District Court had the jurisdiction to adjudicate the merits of this matter. Respondents further argument that the Kanvicks should have brought their petition in the adoption proceeding is without merit as the court in a dissolution has broad powers to determine all the problems of dissolution including division of property, support, and custody in which the matter of visitation is inherent. See In re Marriage of Wilson (1980), 186 Mont. 290, 296, 607 P.2d 539, 542; § 40-4-208, MCA; § 40-4-211, MCA; § 40-4-217, MCA. Having thus disposed of the jurisdictional issue, we move on to the merits of the Kanvicks' appeal.

The Kanvicks complain that in its decision the District Court relied upon certain intimations that K.R.'s natural father had sexually abused her and that these intimations

were neither proven nor testified to as being accurate. Because the father often lived in the grandparents' home, the court concluded that the Kanvicks would be unable to protect K.R. from her father.

Evidence of sexual abuse was testified to by a clinical psychologist, Dr. Veraldi, who had been treating K.R. The psychologist testified to the psychological effects of such abuse on a child's sense of security and trust in her current custodian. Specifically, the doctor testified as follows:

> Q. What was the purpose of [K.R.] coming to see her? A. Her mother brought her in because she believed that [K.R.'s] behavior and some of her statements indicated that she may have been sexually abused.
>
> Q. Did you talk to [K.R.] about that? A. Yes, I did.
>
> Q. Did you reach an opinion as a result of your work with the child? A. During the course of my sessions--not immediately, but during the course of my sessions, yes, [K.R.'s] behavior indicated some concerns about sexual problems, and [K.R.] made--later made statements to me that she had been touched in a sexual manner, a manner that made her feel uncomfortable by her father.

No objection was made to these statements.

Dr. Veraldi was careful to thoroughly discuss the psychological harm done to and the resulting needs of a sexually abused child.

> THE WITNESS: There are a number of short and long-term consequences on the child, but one of the most significant is a loss of a sense of security and a real fear that something has happened to the child and is very upsetting to them, but they can't control it. The adults that should be protecting them are not protecting them so you have what's called a betrayal of trust. This interferes gradually on a long-term basis with all relationships, because the trust is lost.

- 8 -

. . .

> A: One of the most important things that should happen when a child discloses abuse is adults who have care of that child need to believe that child, otherwise the betrayal of trust becomes even more serious. It doesn't just pertain, then, to the offender, it pertains to all other adults that the child should be able to rely on so that to regain the trust of a child that says "So and so touched me in a way that made me feel uncomfortable," it is important that you believe that child.

Dr. Veraldi testified as an expert witness under Rule 703, M.R.Evid., which reads:

> The facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in a particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Thus, an expert is allowed to rely upon the report and opinions of other doctors, Matter of G. S. (Mont. 1985), 698 P.2d 406, 409-410, 42 St.Rep. 451, 455, hearsay, Azure v. City of Billings (1979), 182 Mont. 234, 255, 596 P.2d 460, 471-472, and those facts she or he has garnered through an independent investigation. State v. Hallam (1978), 175 Mont. 492, 501, 575 P.2d 55, 61. The credibility of the source of the opinion goes to its weight and not its admissibility. Azure, 596 P.2d at 472. The District Court properly considered the doctor's testimony in making its decision.

Lastly, the Kanvicks assert that the District Court abused its discretion in holding that visitation by the Kanvicks was not in K.R.'s best interest.

Section 40-9-102(2), MCA, allows the court to grant a grandparent visitation rights only after a finding that the visitation would be in the child's best interest. The District Court chose not to allow visitation in this matter

- 9 -

because the natural father lived with his parents, the Kanvicks, a majority of the time and that the Kanvicks were not able to ensure that he would not interfere with their visits with his daughter. Mr. Kanvick testified that he had no plans to restrict his son's comings and goings from the Kanvick home. He also testified that his son stays at the home between three and seven days a week or "whenever he feels like it." Testimonial evidence presented by respondent's expert reveals that due to the possibility of sexual abuse any contact with K.R.'s father could result in severe psychological damage to K.R. We will not reverse the District Court absent clearly erroneous findings which result in an abuse of discretion. In re Marriage of Goodman (Mont. 1986), 723 P.2d 219, 220, 43 St.Rep. 1410, 1412; Rule 52(a), M.R.Civ.P. The District Court did not discount the beneficial effects of the Kanvicks' relationship with their grandchild and encouraged K.R.'s mother to continue to allow visits in her home. The court, however, did recognize that a regular visitation schedule could most likely force K.R. to visit her natural father as well. It did not abuse its discretion by refusing such a schedule.

Affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices

- 10 -