No. 93-379

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

In Re the Marriage of,

CATHERINE ANN HUNT,

    Petitioner and Respondent,

and

DELBERT ORTON HUNT,

    Respondent and Appellant.



APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable G. Todd Baugh, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

    V. Joe Leckie, Billings, Montana

    For Respondent:

    Kevin T. Sweeney, Sweeney & Healow, Billings, Montana

Submitted on Briefs: December 16, 1993

Decided: March 17, 1994

Filed:

Clerk

Justice Fred J. Weber delivered the Opinion of the Court.

Delbert Orton Hunt appeals the decision of the District Court of the Thirteenth Judicial District, Yellowstone County, in a proceeding initiated by him to reduce child support. Mr. Hunt also appeals the court's decision in petitioner Catherine Ann Hunt's cross-motion which placed conditions on his visitation privileges. We affirm in part, reverse in part and remand to the District Court for a redetermination of child support.

Mr. Hunt presents the following issues on appeal:

I. Can the joint custodial rights of one parent be made inferior to children's outside activities when the commitment to such activities was the sole decision of the other joint custodian?

II. Did the District Court abuse its discretion in unilaterally placing conditions upon one joint custodian without imposing those conditions upon both joint custodians?

III. Did the District Court err in computing the proper child support amount of the appellant?

IV. Did the District Court abuse its discretion in ordering the appellant to sign a wage assignment in the amount of $500.00 per month over and above all amounts collected by the Child Support Enforcement Division for unpaid back child support and current child support?

This case is a particularly disturbing example of the husband's efforts to evade his duties and responsibilities as a parent concerning the support of his children subsequent to a dissolution of marriage. The marriage of Catherine Ann Hunt and

2

Delbert Orton Hunt was dissolved on April 26, 1991, in Yellowstone County, Montana. At the time of the dissolution, the District Court ordered Mr. Hunt to pay $800 per month for the support of the parties' two minor children. Mrs. Hunt testified that after the dissolution, Mr. Hunt told her she would never see a penny of child support from him.

Indeed, since that time, Mr. Hunt has seemed to go out of his way to avoid paying any child support to Mrs. Hunt voluntarily. The only child support Mrs. Hunt has received has been seized involuntarily from Mr. Hunt. Mr. Hunt has not cooperated in the least in this respect and has been held in contempt of court for failing to pay child support. The District Court stated in its findings and conclusions as follows:

> 8. It is unarguably clear to the Court that Delbert Hunt refuses to pay child support and will go to some effort to evade his support obligation. Delbert Hunt is in contempt of court. His employer may be assisting him in support avoidance. Delbert Hunt comes to the Court arguing that this child support should be reduced, but since the time of termination of garnishment of support with the end of his summer job, he has paid no sums whatsoever to his former wife for the care of his children. Delbert Hunt has the ability to pay child support but simply refuses to pay.

Mrs. Hunt received $4,427.48 for child support then owing when Mr. Hunt sold real property in Billings in July of 1991. Through seizure of 1992 wages, Mrs. Hunt received $3,641.40. With the additional amount of Mr. Hunt's share of unpaid medical expenses for the children of $469.55, Mr. Hunt owed a total of $10,014.15 to Mrs. Hunt as of December 23, 1992, the time of trial on his petition for modification of child support.

3

A witness from the Child Support Enforcement Division of the Montana Department of Social & Rehabilitation Services testified that it was reported to that agency that Delbert Hunt was going by or using the pseudonym of "Delmar Hunt" in Oregon and bragging about not having to pay child support. That agency has had a difficult time in its collection efforts in attempting to extract support money from Mr. Hunt.

In his petition for modification of child support, Mr. Hunt requested that his support payments be reduced to $396--$198 per child per month. After recalculating the amount of support according to the child support guidelines, the District Court reduced the monthly obligation from $800 to $741--$370.50 per child. In making this calculation, the court imputed income to Mr. Hunt of $5,000, concluding that Mr. Hunt was voluntarily unemployed during seven months of the year when he was not working as an aerial fire fighter pilot in Oregon from May to October. The court also considered per diem payments of $6,120 annually which Mr. Hunt was paid and which defrayed his costs of self support.

Mr. Hunt also receives a bonus at the end of the fire fighting season from his employer. This bonus has not been available for garnishment as his employer has financed a pickup truck for him and takes an annual payment out of the end-of-season bonus.

Mr. Hunt's winter unemployment has been a factor since the parties' dissolution of marriage; prior to that time Mr. Hunt worked during the winter months as a pilot and his annual income was considerably higher than it has been since the time of the

4

dissolution. While Mr. Hunt has contended that there is no employment for him in his field during the winter, the court was not convinced that he could not earn income during that period.

In addition to modifying the amount of support, the District Court ordered that Mr. Hunt sign a wage assignment in the amount of $500 per month over and above all amounts collected by the Child Support Enforcement Division for unpaid back child support.

In response to Mr. Hunt's petition for modification of child support, Mrs. Hunt filed a cross-motion to clarify the parties' joint custody plan and "re-tool" it due to Mr. Hunt's refusal to communicate with her, particularly when he is exercising his weekend visitation privileges. Mr. Hunt had refused to let her know where he would take the children during those weekends and has insisted that all communications regarding the children be conducted through third persons--specifically, his mother or his attorney.

The District Court ordered that Mr. Hunt give Mrs. Hunt 48 hours advance notice for each visitation period; that he provide her with his home address and telephone number; that he provide her with an itinerary of each visitation, including the address and telephone number of the place where each visit is to occur; and that he provide Mrs. Hunt with a time for commencement and conclusion of each visit. The court also ordered that priority be given in scheduling visits to the children's outside activities.

Also in response to Mrs. Hunt's cross-motion, the court awarded the 1992 tax exemption for both children to Mrs. Hunt. The

5

court further ordered that Mr. Hunt is not entitled to the exemption for the parties' son as provided by the decree of dissolution unless he is current in paying his child support.

## Issues I & II: **Modifications to Visitation**

Appellant's first two issues both deal with limitations placed on Mr. Hunt's exercise of his visitation privileges; Issue I involves the court's prioritizing the children's prescheduled activities during the visitation periods. Specifically as to this issue, the District Court addressed whether the husband could unilaterally change the son's plans for weekends when the son was scheduled to participate in organized team sports.

Issue II involves the court's ordering Mr. Hunt to inform Mrs. Hunt of his itinerary and whereabouts during the time he exercises visitation with the children. As both Issues I and II relate to the ability of the District Court to place restrictions and conditions on visitation, we consider them together. The question common to them both is whether the limitations were justified here.

Visitation is an inherent part of child custody, in which the district courts have broad powers to determine all problems concerning custody and visitation. Kanvick v. Reilly (1988), 233 Mont. 324, 329, 760 P.2d 743, 747. The standard of review for custody and visitation is whether substantial credible evidence supports the district court's judgment. In re the Marriage of Nash (1992), 254 Mont. 231, 234, 836 P.2d 598, 600. We will overturn a court's custody or visitation decision only when the court's findings and conclusions clearly demonstrate an abuse of

6

discretion. In re the Marriage of Anderson (1993), 260 Mont. 246, 252, 859 P.2d 451, 454. Thus, the issue before us in this case is whether the court abused its discretion by placing limitations and conditions on the exercise of Mr. Hunt's visitation. See In re the Marriage of Wackler (1993), 258 Mont. 12, 16, 850 P.2d 963, 966.

The circumstances behind these two issues are as follows: The parties share joint custody of their two children. Mrs. Hunt has primary physical custody of the children and Mr. Hunt enjoys liberal visitation. Mr. Hunt has insisted upon keeping the details of his place of residence, telephone number, and other pertinent information a secret from Mrs. Hunt. He has not allowed Mrs. Hunt to contact him directly regarding visitation or other matters involving the children and has forced her to contact third parties whenever she has a need to communicate with him for any reason. During the times Mr. Hunt exercises visitation, he has refused to permit Mrs. Hunt to know the whereabouts of the children.

During the approximate five-month period from June through October when he is employed, Mr. Hunt does not exercise visitation frequently because of the nature of his job as a pilot; however, during the remaining months of the year, he generally has the children with him on alternating weekends. This has caused problems for Mrs. Hunt because Mr. Hunt will not inform her where he will be during these times and often takes the children out of Billings where they reside with Mrs. Hunt. The record further reveals a litany of communication problems relating to visitation, the activities of the children and the transferring of the children

7

to and from Mr. Hunt for weekend visitation.

Mr. Hunt objects to the court's prioritizing of team athletic activities which the parties' 11-year-old son is involved in. Particularly, Mr. Hunt had protested his son's involvement in an organized hockey program in Billings which Mrs. Hunt had arranged and which sometimes required the son to be present for Saturday hockey games. Mr. Hunt also protested the son's attendance at Friday afternoon baseball practices.

Mr. Hunt particularly objected to Mrs. Hunt's ability to structure these activities unilaterally, knowing that the commitments to these team sports could interfere with his visitation periods. He argues that the time he spends with his children should "take on the nature of 'sacred' time" and that he should not have to abrogate his custodial rights to fulfill commitments made by Mrs. Hunt. He contends that he cannot be forced to take on a role as the children's baby-sitter and chauffeur for commitments Mrs. Hunt has made for the children.

He asks this Court to "enforce his right to be involved in the children's outside activities" especially during his time of visitation, which he refers to as his "custodial time." He claims this is "the only way in which he is able to protect his ability to have frequent and continuing contact with his children and share in the rights and responsibilities of child raising."

Mr. Hunt's second issue relates to the District Court imposing conditions upon him without imposing the same conditions upon Mrs. Hunt. We note that there is no evidence in the record that this

8

has been a problem for Mr. Hunt. To the contrary, Mr. Hunt knows where Mrs. Hunt resides with the children, he knows the telephone number there and, in fact, often speaks with the children over the telephone. There is additional evidence in the record that Mrs. Hunt has advised Mr. Hunt in the past through third parties when she has taken the children away from Billings.

Mr. Hunt contends that the above-described restrictions imposed on him by the District Court concerning his exercise of visitation constitute a modification of custody and, thus, the District Court abused its discretion by modifying custody without making specific findings of fact that such modification was in the best interests of the children. We disagree.

The District Court here was faced with a visitation problem compounded by the parties' inability or refusal to communicate with each other about their children and what is best for them. Mrs. Hunt asked the court to specify visitation conditions; she did not ask for a change in visitation. The District Court has the power to clarify visitation rights and to specify times for a parent's exercise of visitation and the mode of arranging for visitation. Section 40-4-217(3), MCA, allows the District Court to modify an order granting or denying visitation "whenever modification would serve the best interest of the child . . ." See, e.g., Baker v. Baker (1982), 198 Mont. 371, 646 P.2d 522.

More recently, in In re the Marriage of Kovash (1993), 260 Mont. 44, 52, 858 P.2d 351, 356, we affirmed a district court's decision which conditioned future visitation upon the father's

9

behavior toward his children in the exercise of his visitation. In Wackler, 850 P.2d at 966, the district court modified the visitation schedule, stating that:

> Section 40-4-217(3), MCA, grants the district court authority to modify an order granting or denying visitation "whenever modification would serve the best interest of the child . . . ." In this instance, Rebecca was not prejudiced by the lack of notice because the District Court only clarified visitation rights as a result of some apparent confusion relating to the previous visitation schedule. Rebecca's counsel was able to discuss these matters and properly raise Rebecca's concerns as to Thomas' request to extend visitation rights, which was denied. We hold that the District Court did not err in its clarification of Thomas' visitation rights.

The present case is directly comparable to Wackler. There is ample evidence in the record to support the court's findings that the best interests of the children are served by communication between the mother and father regarding the father's itinerary for his weekend visitation, advance notice of 48 hours prior to scheduling visitation and giving priority in scheduling visits to the children's outside activities.

During the hearing on the parties' motions for modification of the original decree, the court stated as follows:

> [THE COURT] Now visitation. I am not exactly sure what has been requested there. The way you all are going about it is all wrong. I know it takes two to communicate but I know also that one person can sabotage the whole thing. I had only heard the two of you testify here today, but judging from that, Mr. Hunt, I would have to say that you are probably more at fault there for the lack of communication than Mrs. Hunt . . .

> If I were going to give you some suggestions, I would say you got to learn how to communicate. You got to get that chip off your shoulder, you got to get over being mad. Quit spending money on an attorney, good as he may be in these kinds of proceedings, what you need is

10

someone to give you some counseling in how to be able to communicate with an ex-spouse.

The simple matter of it is, is that you either learn that or you run a real big risk of messing up these two kids. The rate you are going, these kids will be lucky if they come out of this without some serious emotional scars. . . . If you don't do it, the kids are the ones that suffer.

. . . I do know if they are involved in your fighting that that's not good for them.

You cannot put these kids in the middle. They will tell each of you separately what they think you want to hear. . . . It's not fair of you guys to make him choose, that's absurd. He is too little to have that kind of burden, he is just a kid, you guys are the adults.

What you have to do, is you have to realize team sports have a different obligation than individual sports. Team sports you have got an obligation to the team as well as to yourself, so if you are involved in a team sport, if you are going to get involved in a team sport in the first place, which is something the parents ought to discuss especially in this situation like this where if you think forward down the road, you realize it's going to have some effects on visitation. But if he is going to be there, then you got to expect that it's going to effect your visitation some because he is going to need to go to those team sports whether it's baseball or hockey or whatever.

Now if you don't want that to be the situation, the two of you need to discuss that . . . you can't leave it up to him, and you can't make him choose at the last minute, it's not fair.

So again, that gets back to the beginning point involving the child, that is you have to learn how to discuss these things and if you can't, the child is going to suffer. If you have to work through intermediaries . . . it's not going to likely be a situation that will work. You can't, there is not enough discussion of details in a short enough time to be able to reach decisions, and what will happen is what happened in this case, mom will make the decision because dad is not involved, you have got to get involved.

Although the court stated its belief that the parties would

benefit from counseling in order to learn how to communicate with

11

one another for the benefit of the children, it did not order such counseling and further did not order that the parties communicate with one another other than to order Mr. Hunt to provide Mrs. Hunt with the above-described information concerning the children's whereabouts when they spend time with their father.

In addition to other support from the record, including the comments of the District Court, Mr. Hunt testified during the hearing as follows:

> Q. (by Mr. Sweeney): All your former wife is asking for, Mr. Hunt, is for you to give advance notice of when you're coming to Billings to see the children, that you let her know your itinerary, and the address and telephone number where the children and you can be reached if necessary, and that you take into account in making your plans for the visits the activities of your children.

> A. [Mr. Hunt] I don't have any problems with that, Mr. Sweeney.

Subsequently, when examined by his own counsel, Mr. Hunt further testified:

> Q. [by Mr. Leckie] You're not telling the Court that you have any objection to maintaining the kids and their interests or activities are you?

> A. No I'm not.

Mr. Hunt's testimony before the District Court does not indicate that he would have difficulty with the subsequent decision of the court to prioritize the children's activities, nor does it indicate that he would have difficulty with providing Mrs. Hunt certain information concerning his exercise of visitation. The record indicates further that the District Court considered the effect that the current situation could have on the children and

12

considered their best interests in its ruling clarifying visitation.

The record further provides that although Mr. Hunt has expressed a desire to share in decision-making regarding the children's activities, he has refused to communicate with Mrs. Hunt except through third-party intermediaries. The District Court determined that this was not a satisfactory method of communication for such matters. We conclude that the conditions placed on visitation, under the circumstances presented in this case, were ordered with the best interests of the children as the primary consideration.

We hold the District Court did not abuse its discretion by requiring Mr. Hunt to provide information to Mrs. Hunt concerning his visitation with his children. We further hold that the court did not abuse its discretion by ordering that priority be given to the children's scheduled activities.

## Issue III.

Did the District Court err in computing the proper child support amount of the appellant?

Mr. Hunt asserts numerous errors in the computation of his child support obligation under the Child Support Guidelines: (1) the court erred by imputing income of $5,000; (2) the court erred in attributing $6,100 in per diem pay to him; (3) the court inappropriately determined day-care costs at $300 per month; (4) the court erred by including $1,000 as value of his camper which it included in net assets; and (5) the court erred in allowing a reduction of $1,800 for Mrs. Hunt's retirement contribution.

13

Whenever a district court modifies a child support order, it is required to determine the child support obligation by using the factors set forth in §§ 40-4-204(1) and (2), MCA, and the Uniform Child Support Guidelines adopted by the Department of Social and Rehabilitation Services. Section 40-4-204(3), MCA, further provides:

> (a) . . . The amount determined under the guidelines is presumed to be an adequate and reasonable support award, unless the court finds by clear and convincing evidence that the application of the standards and guidelines is unjust to the child or to any of the parties or is inappropriate in that particular case.

When this Court reviews child support awards, a presumption exists in favor of the district court's determination, and we will reverse the district court only if it has abused its discretion. In re the Marriage of Sacry (1992), 253 Mont. 378, 382, 833 P.2d 1035, 1038. We will address each of Mr. Hunt's claims of error briefly with this standard and presumption in mind:

(1) Imputed income: The District Court specifically found that Mr. Hunt chooses to be unemployed for approximately seven months of the year. The record supports this finding, particularly where Mr. Hunt's income in the two years prior to the dissolution was substantially higher when he worked year-round. The court found that Mr. Hunt was capable of earning income during his months of voluntary unemployment.

In In re the Marriage of Olsen (1993), 257 Mont. 208, 215, 848 P.2d 1026, 1030, we stated that where a parent is voluntarily unemployed or underemployed, the court may impute income based upon the parent's capacity or ability to earn income. We have also

14

favored imputing income in other recent cases. See, e.g., In re the Marriage of Chiovaro (1990), 247 Mont. 185, 805 P.2d 575 (we affirmed the district court's discretionary imputation of income for track coaching fees which were available to a father had he not voluntarily chosen to refrain from coaching); In re the Marriage of Weed (1992), 254 Mont. 162, 836 Mont. 591 (we reversed a decision not imputing a yearly minimum wage for the purpose of calculating child support); and in Mooney v. Brennan (1993), 257 Mont. 197, 848 P.2d 1020 (we affirmed imputing income to an incarcerated prisoner, even though the prisoner has no assets and earns no income while incarcerated.)

In In re the Marriage of Mitchell (1987), 229 Mont. 242, 248, 746 P.2d 598, 602, we said that the court's findings must "realistically reflect what the parents are capable of earning using their actual earnings as a guideline." In this case, the trial court imputed earnings of $5,000 for approximately seven to seven and one-half months. In the two years prior to the dissolution when Mr. Hunt chose to work during the winter months, his income was substantially higher than $5,000 for that period. This amount approximates a minimum wage for similar periods. We conclude that this is supported by Mr. Hunt's testimony that he was physically capable of working although he found it difficult to earn income as a pilot during his period of voluntary unemployment.

(2) Per diem: Mr. Hunt also contends that the District Court erred in attributing $6,100 in per diem pay to him. The Child Support Guidelines specifically provide that per diem is an item of

15

income. Section 46.30.1508(b), ARM. Mr. Hunt testified that he is paid per diem at $66 per day when he is away from Wenatchee, Washington during his months of employment and that in 1992 that amount was $792. However, he also testified that he received other compensation from his employer for his expenses when he was not away from Wenatchee, Washington, and that amount was total reimbursement for receipts turned in for food, lodging, utilities and gasoline. He testified that he did not include these expenses of up to $40 per day as reimbursement on his Rule 28 affidavit as a source of income. Mr. Hunt testified that he would either receive the $66 per day per diem or up to $40 per day reimbursement which can also be classed as per diem. He did not present any testimony as to the actual amount he received as reimbursement, he testified that he considered that they were Butler Aviation's expenses and that he did not include them as a source of income in his Rule 28 statements. These reimbursements were not included in Mr. Hunt's gross income.

The record demonstates that in 1992 Mr. Hunt received $792 in per diem at $66 per day for time that he was away from his home base of employment in Wenatchee, Washington. It further demonstrates that he receives up to $40 per diem for each day's expenses when he is not away from the home base during the months of his employment. Mr. Hunt testified about his reimbursement for living expenses from Butler Aviation as follows:

Q. [BY MR. SWEENEY] When you're not away from Wenatchee, Washington do you receive any per diem?

A. No per diem.

16

Q   Do you receive any other sort of compensation to . . . .

A.   Butler pays my expenses if that's what you're asking.

Q.   Yes, and what do they pay you as far as your expenses, when you're not receiving the $66 per day.

A.   I don't know what it is, Mr. Sweeney, I turn in my receipts.

Q.   Okay, so you turn in whatever receipts you have for food?

A.   That's correct.

Q.   Lodging?

A.   That's correct.

Q.   Utilities or gasoline?

A.   That's correct.

Q.   And Butler reimburses you for that in toto, is that right?

A.   That's correct.

Q.   Okay, have you disclosed in the Rule 28 statement or included in the Rule 28 statement any of these reimbursed expenses?

A.   They're Butler's expenses.

Q.   Have you included them in your Rule 28 statement as a source of income to you?

A.   No.

Q.   Do you know approximately how much you received from Butler.  Would you have received, how much do you receive per day or allowed per day in expenses?

A.   I think it's up to $40 a day.

Q.   So if you turn in $40 a day of expenses when you're not receiving the $66, Butler will reimburse the $40?

A.   I think you could say that.

Mr. Hunt further testified his length of employment for 1992,

17

the first year of a three-year cycle, ran from June 10 through October 23. That period of time equates to 146 days. Subtracting the twelve days for per diem at $66 per day (12 times $66 equals $792), that leaves 134 days at $40 per day. At $40 per day for 134 days, Mr. Hunt would receive $5,360 reimbursement. Added to the actual $792 in per diem he testified that he received, the total amount demonstrated by the record for per diem and reimbursement is $6,152.

Mr. Hunt did not provide the court with specific information regarding the amount of his reimbursement for living expenses and appeared reluctant to divulge that information. We conclude that the court did not err in attributing $6,120 in per diem to Mr. Hunt to be included in his gross income for purposes of child support computation.

(3) Day-care costs: Mr. Hunt also contends that the court inappropriately determined day-care costs at $300 per month. Mrs. Hunt testified that she had had to make arrangements with friends to care for her children, that she occasionally had to forego working extra hours in her work as a surgical nurse because she had no sitter and that she could arrange for more satisfactory child care arrangements if she did not have to rely on friends and relatives for these services.

The amount allocated by the court is not excessive under the circumstances even though Mrs. Hunt testified that she currently spends much less than $330 per month for child care. At the time of trial, the children were ages eleven and five. The record

18

provides sufficient information to support the court's determination of monthly day-care costs.

Mrs. Hunt is a registered nurse and works as a surgical nurse at Deaconess Medical Center in Billings. She testified that she currently worked ten-hour shifts three days a week, was generally on call one day each week and also was on a scheduled call basis every fourth weekend. When she is on call, she can be called in to assist with emergency cases that arise and she must be able to go to work immediately.

Her scheduled day shifts run from 7:00 a.m. to 5:30 p.m. Her on call time one day per week runs from 5:30 p.m. until 7:00 the next morning. On weekends, she is on call for 48 hours, from 7:00 Saturday morning until 7:00 Monday morning.

When Mrs. Hunt receives a call to work during an "on call" period, she has no time to arrange for a sitter so that must be prearranged for the entire time. She testified that this was generally not a problem during the week as her regular child care provider kept the children overnight. However, the weekends posed a problem. She either has to hire a sitter for the entire weekend or she must give up her weekend of on call work and thus forego income.

Mrs. Hunt further testified that the child care expense could be as little as $200 per month but if she includes activities which the children prefer after school, such as the YMCA's after school programs, the charges would be higher. She testified further that she did not spend that much per month now because she did not

19

receive child support and could not afford the expense. She specifically testified that if she had regular child support coming in so she would not have to rely on neighbors and friends for free child care, the day-care costs to provide for both children would be approximately $330. Other testimony established that this expense would result in an income tax credit of $30 for Mrs. Hunt and that the net expense would be $300.

When questioned about the low amount Mrs. Hunt expended in day-care costs, she testified as follows:

A. [BY MRS. HUNT] My day care figures for this year is [sic] just about the same because I've had a lot of friends helping me, neighbors helping me and it's right around $1200 for this year. But if I had the money and if I was getting the child support and getting the child care money I wouldn't have to be taking advantage of all the rest of this, which I do.

Q. [BY MR. LECKIE] You do have money in the bank though, if you had to pay for day care you could use the money in the bank couldn't you?

A. I suppose if I got desperate, I don't look at that money [savings] as my operating costs. I am a saver and I have to have some savings.

Q. Well, you only spent $1200.

A. Nor do I think that I need to pull on my savings to cover for his deficit of not paying child support.

Q. You're only asking that he pay his guideline share of child support though, aren't you?

A. His share of the $330?

Q. No, what you actually spend, aren't you? Are you asking the Court to make him pay a share of $330 a month when in fact you don't have a history of ever spending that amount?

A. I think that's a pretty reasonable amount. I think that even at that we're getting off pretty cheap. I don't think that I should have to compensate him because

20

I have to take advantage of friends and . . . .

Q. . . . .you spend a $100 a month now but yet you say you could spend $230 a month more?

A. There's another hundred alone just in weekend call that I haven't had to spend so far because I've been able to get it covered other ways and when I give up my call I'm also giving up some income.

The Child Support Guidelines allow the court to use an amount which is a reasonable day care cost. Section 46.30.1525, ARM. We conclude the court did not err in attributing $300 per month for child care despite the fact that Mrs. Hunt had been spending less than that amount.

(4) The camper: Next, Mr. Hunt contends that the court erred by including $1,000 as value of his camper which it included in net assets. This too is a discretionary act under the Child Support Guidelines and supported by the record. Section 46.30.1514, ARM. Under that section, income should be attributed to the net market value of non-performing assets because the parent would earn income from them if they were sold and invested. Examples of such assets are vacation homes, idle land and recreational vehicles. Section 46.30.1514, ARM.

Mr. Hunt contends that this asset is essential to his employment because he lives in it for five months out of the year when he is working. Mr. Hunt is paid per diem for his expenses while he is fighting fires. We conclude that the camper, although it may cut down on those expenses, is not an essential item of personal property and is not income-producing. An example of an income-producing item of personal property would be an airplane

21

owned by Mr. Hunt which he used for his job. To allow Mr. Hunt to exclude this asset would be to give him a double deduction in terms of calculating child support as he is also allowed the self support reserve amount under § 46.30.1521, ARM, which allows a minimum amount of income which a parent must retain to meet the minimum subsistence needs of his or her household for certain needs-- including shelter. Thus, the court did not err in including the camper as a non-performing asset under the guidelines.

(5) Mrs. Hunt's retirement contribution: Finally, Mr. Hunt contends that the court erred in allowing a reduction of $1,800 for Mrs. Hunt's retirement contribution. We agree.

Contributions toward Internal Revenue Service approved retirement plans, whether voluntary or mandatory, are deductible from gross income up to the actual amount contributed or 6.5% of gross income, whichever is less. Section 46.30.1516(1), ARM. The record does not support Mrs. Hunt's inclusion of this amount as a retirement contribution. There was no testimony that the money is being placed in an Internal Revenue Service approved retirement plan. The District Court improperly deducted $1,800 from Mrs. Hunt's gross income as a retirement contribution without any evidence that the money was invested in an approved retirement plan.

In summation, we conclude that the District Court abused its discretion by improperly deducting $1,800 from Mrs. Hunt's gross income. We further conclude, however, that the record supports the court's calculation of a reasonable amount for day-care costs,

22

properly included amounts for per diem and imputed income and properly included Mr. Hunt's camper as a nonperforming asset.

We hold the District Court erred in calculating Mr. Hunt's child support obligation.

## Issue IV.

Did the District Court abuse its discretion in ordering the appellant to sign a wage assignment in the amount of $500.00 per month over and above all amounts collected by the Child Support Enforcement Division for unpaid back child support and current child support?

Mr. Hunt's final argument is that the Child Support Enforcement Division is the sole party allowed to enforce the court's decree and, therefore, the court abused its discretion in ordering him to assign wages in the amount of $500 per month over and above all amounts collected by the Child Support Enforcement Division. This argument is without merit. According to § 40-4-209, MCA, the District Court had authority to execute a security or other guarantee for the payment of child support delinquencies which are in amounts equal to the total of six months support payments.

We hold the District Court did not abuse its discretion in ordering the assignment of Mr. Hunt's wages.

Affirmed in part, reversed in part and remanded for recalculation of child support without the $1,800 retirement contribution exclusion from Mrs. Hunt's income.

_____
Justice

23

We Concur:

_John Conway Harrison_

_Terry Trieweiler_

_William E. Hunt Sr._

_____
Justices

March 17, 1994

## CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:

V. JOE LECKIE
Attorney at Law
307 Western Federal Savings Bldg.
2929 Third Ave. North
Billings, MT  59101

Kevin T. Sweeney
SWEENEY & HEALOW
1250 15th St. West, Ste. 202
Billings, MT  59102

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: _____
Deputy