Nos. 95-219 and 96-222

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

IN RE THE MARRIAGE OF

PEGGY C. G. SCHAPLOW,
n/k/a PEGGY C. GANDER,

      Petitioner and Appellant,

  v.

TERRY SCHAPLOW,

      Respondent and Respondent.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
In and for the County of Gallatin,
The Honorable Dale Cox, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

            Marcelle C. Quist, Kendra K. Anderson, Quist, Bowden
& Anderson, Bozeman, Montana

      For Respondent:

            Edmund P. Sedivy, Sedivy, Bennett & White, Bozeman,
Montana

FILED

Filed: DEC 1 9 1996

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

Submitted on Briefs:   September 19, 1996

          Decided:   December 19, 1996

Clerk

Justice William E. Hunt, Sr., delivered the Opinion of the Court.

Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1988 Internal Operating Rules, this decision shall not be cited as precedent and shall be published by its filing as a public document with the Clerk of the Supreme Court and by a report of its result to Montana Law Week, State Reporter and West Publishing Company.

The marriage of Peggy C. G. Schaplow, n/k/a Peggy C. Gander (Peggy) and Terry Schaplow (Terry) was dissolved in May 1991 pursuant to a decree issued by the Eighteenth Judicial District Court, Gallatin County. Peggy appeals from the court's order establishing a custody and visitation schedule and removing her "primary residential custodian" status, and from the court's order finding her in contempt.

We affirm.

We review the following issues:

1. Did the District Court err in "modifying" the parties' existing custody and visitation arrangement?

2. Did the District Court err in ordering that the parties' two children continue their religious training?

3. Did the District Court err in finding Peggy in contempt?


**INTRODUCTION**

This case is about two capable adults who have made a number of failed attempts to manage on their own the custodial arrangements of their children. Upon the dissolution of their marriage, Terry and Peggy tried what they have termed a "non-

2

traditional" approach to custody and visitation, where scheduling was subject only to their negotiations, not to the provisions of a court decree or order. However, since the inception of this "non-traditional" approach, a period of about four years, the parties have argued incessantly, privately and in court, about nearly every aspect of the daily interrelationship between each of their own lives and their children's lives. The record establishes a pattern in which the parties seek assistance, disregard the recommendations given, and then seek assistance again. This dispute, at once impressive and irrational in its detail and intensity, was presented to the District Court for an ultimate resolution. Peggy, who requested that the District Court solve the scheduling problem "once and for all," disapproves of the resolution given.

## FACTS

Terry and Peggy were married in Bozeman, Montana in June 1977. The couple have two children: Jesse, born July 15, 1981; and Jay, born May 29, 1984. Terry and Peggy separated in September 1989, and their marriage was dissolved in May 1991, pursuant to a decree issued by the Eighteenth Judicial District Court, Gallatin County. The court's decree incorporated the parties' Separation, Custody, and Property Settlement Agreement, which provided for joint custody of Jesse and Jay and designated Peggy as the primary residential custodian. The Agreement also provided a detailed custody and visitation schedule for the period June 6, 1991 to June 15, 1992; this schedule was subject to mutual modification by the parties. In addition, the Agreement provided that upon the termination of

3

the time period covered by the custody schedule, "the parties will evaluate future schedules with consultation with Dr. [Charles] Kelly [a clinical psychologist retained by the parties to make a custody evaluation]. If the parties are unable to resolve the future schedule with Dr. Kelly, then the parties agree to mediate any disputes in a format suggested by Dr. Kelly and agreed to by the parties."

Although the parties themselves created the initial custody schedule, they had difficulties in adhering to it almost immediately after its adoption by the court. It is quite apparent from the record that one of the main reasons that such a detailed schedule was created in the first place, and why, ultimately, strict compliance with the schedule was difficult, was the fact that each parent was actively involved in a number of activities with the children. Terry, a former high school and college basketball player, encouraged his two sons to become involved in all sports, but especially baseball and basketball. He at different times coached each of his sons, and made every effort to enroll the boys in various sports camps and programs. Peggy, it is evident from the record, has a great fondness for snow skiing, and encouraged the boys to undertake that sport. Peggy enrolled Jesse and Jay in a number of ski programs in the Bozeman area. In addition, when Peggy and Terry were married, they decided together that the boys would attend Sunday school classes at the First Presbyterian Church in Bozeman, and would receive weekly Taekwondo instruction. Not surprisingly, the different activities' schedules

4

conflicted with each other, with the temporary custody and visitation schedule established in the dissolution decree, and with a subsequent custody and visitation schedule created by the parties.

Although the parties agreed to a schedule in January 1992 that generally provided Terry custody of the boys three days per week and Peggy custody of the boys four days per week, a schedule which remained in effect for nearly three years, the parties were unable to resolve, amicably or otherwise, the inevitable problems that periodically arose because of the conflicting schedules of the boys' various activities. Each party had begun to "claim" certain activities, so that difficult situations were created if, for example, ski class conflicted with a basketball game, or if one parent's "claimed" activity fell on a day that the other parent had custody of the children. Both Terry and Peggy began seeking court assistance to resolve these disputes, most of which had reached a fevered pitch. (With respect to a dispute regarding the relationship between custody and one of the boys' participation in a youth baseball league, the court was presented with evidence that the boy's batting average while in Terry's custody was four times higher than it was while in Peggy's custody.) The court issued orders which variously provided for and required the boys' participation in ski programs; baseball and basketball practices, camps, and games; and Sunday school.

The court's periodic, "stop-gap" rulings concerning the minutiae of the parties' daily lives and their children's daily

5

lives did not fully solve the scheduling problems. Eventually, Peggy filed motions for final determination of visitation rights and contempt, and Terry filed a counter motion for contempt, all of which were heard by the court on October 20 and 21, 1994. The District Court issued its order on December 16, 1994, which provided, in pertinent part, that Terry and Peggy would remain joint custodians of the boys, and that neither party would be considered the primary residential custodian; that during the school year the parties would alternate custody of the children on a weekly basis; that each party would have custody of the children for one half of the summer; that custody of the children on the various national and school holidays was divided nearly equally between Terry and Peggy; and, that each parent ensure that the children participate in the aforementioned athletic and religious activities. The court found Peggy in contempt for failing to make the boys available for Sunday school on three occasions, but suspended the $500 contempt fine and declared that Peggy "may purge herself of the contempt charge provided there are no violations of the Court's order herein for one year." The court stated in its order that it "considered each appropriate factor in Section 40-4-212, MCA and finds that it is in the best interests of the minor children that the following custody schedule and orders incidental thereto be followed[.]" Peggy alleges a number of errors in the court's December 16, 1994 order, and these allegations of error form part of the basis for her appeal here.

Not long after the court's order was filed, each party began filing motions alleging that the other was in contempt for failing to abide by the order. The court considered testimony in support of the motions during two hearings, on September 28, 1995 and December 28, 1995. The court issued an order January 2, 1996, which did not find either party in contempt but did require Peggy to ensure the boys' attendance at sports practices. The court issued a second order on January 8, 1996, holding Peggy in contempt for violating the original dissolution decree by failing to provide Terry with a 1995 IRS form relating to claiming one of the boys as a dependent, and for violating the December 16 order by failing to get the boys to various sports practices. The court applied to Peggy the $500 fine which it had suspended in the December 16 order. Peggy's allegations of error in the court's contempt order form the other basis for her appeal here. Although Peggy filed a notice of appeal to this Court from the District Court's December 16, 1994 order prior to the institution of the contempt proceedings, we have allowed Peggy to appeal both the December 1994 order and the January 1996 contempt order in one action.

**ISSUE ONE**

Did the District Court err in "modifying" the parties' existing custody and visitation arrangement?

In Issue One, Peggy raises three jurisdictional challenges. Peggy first argues that because there was no motion for modification before the court, the court was without jurisdiction to modify the parties' existing custody arrangement as it did in

7

its December 16, 1994 order. Peggy contends that the court improperly modified the custody arrangement as contained in the original decree by removing her "primary custodian" status. Peggy alleges that she requested that the court merely "clarify" matters, noting that her motion before the court was entitled "Motion for Final Determination of Visitation Rights," and that the court recognized the purpose of this document when it stated "The central issue before the Court is Petitioner's Motion for Final Determination of Visitation Rights."

While we are well aware of the firmly established rule that a district court may not rule on matters other than those presented by the pleadings, In re Custody of C.S.F. (1988), 232 Mont. 204, 209, 755 P.2d 578, 581, we cannot glean from the circumstances here a violation of this rule by the District Court. The court's December 16, 1994 order did indeed remove Peggy's "primary residential custodian" status, but this alone did not constitute an improper modification of the original custody determination, nor did it constitute a ruling on a matter beyond the pleadings. The parties have had great difficulty creating a workable, permanent visitation schedule. Neither mediation nor periodic judicial intervention into isolated issues has successfully solved the visitation problem. Peggy finally pleaded with the court in her motion for final determination of visitation rights to "once and for all, establish a proper visitation schedule. ... A final determination of visitation rights of the parties, specifically a simplified visitation schedule, is in the best interests of the

8

children." The parties submitted briefs and proposed visitation schedules. The court heard testimony concerning the various alleged causes of the visitation problems, including testimony from Terry that Peggy had used her "primary custodian" status to derail previous attempts at creating or maintaining visitation arrangements. On the basis of testimony presented at the hearings, and the briefs and proposed visitation schedules presented by the parties, the court ordered that the parties follow the court's specific visitation schedule which provided for nearly equal time with the boys, and that neither party be considered the "primary custodian," a title which had led to visitation problems in the past. The court was asked to resolve a difficult visitation problem, and the provisions of the court's order, including the removal of "primary custodian" status, manifest the court's attempt to do so. To the extent that Peggy has characterized the situation differently, we disagree. There was no District Court error here.

With respect to her second argument, Peggy contends that the court erred by not applying the jurisdictional prerequisite requirements of § 40-4-219, MCA, prior to modifying the decree. Peggy claims that the court's December 16, 1994 order, establishing a new visitation schedule and removing her "primary custodian" status, was a modification which, in the words of this Court's opinion in In re Marriage of Johnson (1994), 266 Mont. 158, 166, 879 P.2d 689, 694, "ha[d] the effect of substantially changing the primary residence of the parties' children, even though the formal designation of 'joint custody' [was] retained." Peggy claims that

9

under these circumstances, <u>Johnson</u> requires that the requirements of § 40-4-219, MCA, must be met before the court may engage in a custody modification. <u>Johnson</u>, 879 P.2d at 694. Peggy argues that the court erred by modifying the parties' visitation and custody arrangement according to § 40-4-212, MCA (the "best interest test"), before conducting a jurisdictional analysis under § 40-4-219, MCA. We cannot agree with Peggy's second argument.

<u>Johnson</u> states, in pertinent part:

> Motions or petitions to modify a sole custody provision or terminate a joint custody provision must satisfy the jurisdictional prerequisites set forth in § 40-4-219, MCA. Likewise, a motion or petition to modify child custody provisions in a dissolution decree which have the effect of substantially changing the primary residence of the parties' children, even though the formal designation of "joint custody" is retained, are to be construed as motions or petitions to terminate joint custody and must satisfy the jurisdictional requirements set forth in § 40-4-219, MCA. *Any effort to modify the physical custody arrangements in a decree which provided for joint custody, which does not seek a substantial change in the children's primary residence, may be considered by the district court according to the best interest standard set forth in § 40-4-212, MCA.*

<u>Johnson</u>, 879 P.2d at 694 (emphasis added). The court here was requested to resolve a bitter, ongoing visitation scheduling dispute; the court's resolution did not "have the effect of substantially changing the primary residence of the parties' children," nor, for that matter, did it have the effect of modifying the decree, save for the removal of Peggy's title of primary custodian. At the time of the hearing on this matter, there existed between the parties a visitation schedule, created by themselves without direction from the court or the original decree,

10

that provided that during the school year Peggy and Terry would divide weekly custody of the boys according to a four day/three day split. As well, each of the parties had had custody of the boys for roughly half of the previous summer. The relevant portions of the court's order provided that the parties would alternate full weekly custody of the boys during the school year, and that each of the parties would have custody of the boys for half of the summer. The order also provided for a nearly equal division of custody on holidays. Finally, the order provided that neither party would maintain "primary custodian" status. These provisions have little to do with, let alone substantially change, "the primary residence of the parties' children." To the contrary, the court's order essentially maintains the number of days the boys were spending at each parent's home under the existing visitation schedule. Section 40-4-219, MCA, is inapplicable here. There was no District Court error.

Peggy's third argument under Issue One is that the court erred in modifying the custody and visitation arrangement because Terry did not first file an affidavit in support of modification, as required by § 40-4-220, MCA. The statute provides:

> (1) A party seeking a temporary custody order or modification of a custody decree shall submit, together with his moving papers, an affidavit setting forth facts supporting the requested order or modification and shall give notice, together with a copy of his affidavit, to other parties to the proceeding, who may file opposing affidavits. The court shall deny the motion unless it finds that adequate cause for hearing the motion is established by the affidavits, in which case it shall set a date for hearing on an order to show cause why the requested order or modification should not be granted.

11

Peggy's argument is misguided, as the provisions of § 40-4-220, MCA, are inapplicable here. First, it is the moving party that must comply with the affidavit requirement; in this case, that was Peggy, not Terry. Second, the statute contemplates a situation where a party requests that the court modify the custody decree; here, such relief was neither requested nor given. To reiterate, at the time of the hearing the parties, while bound by the initial custody decree to the extent that it provided for joint custody and designated Peggy as the primary custodian, were and had been subject to a custody and visitation arrangement largely created by themselves; in any event, the parties had long since left behind the temporary schedule set out in the decree. The relief sought, and the relief given, did not involve a modification of the original decree because the decree no longer controlled the parties' custody and visitation scheduling arrangements. And, pursuant to our discussion of the purpose and effect of the court's removal of Peggy's title as primary custodian, we cannot see how the court's action in that regard would have first required its perusal of a § 40-4-220, MCA, affidavit. Contrary to Peggy's third argument, the court did not commit reversible error.

## ISSUE TWO

Did the District Court err in ordering that the parties' two children continue their religious training?

Peggy has two bases for her allegation of error with respect to Issue Two: Peggy first contends that the court's order requiring the boys' weekly attendance at First Presbyterian Church in Bozeman

12

violated § 40-4-218(1), MCA, in that the court's order infringed on her custodial rights; Peggy also contends that in requiring the boys to attend "Terry's" church, the court's order violated her First Amendment religious rights.

Section 40-4-218(1), MCA, provides:

> Except as otherwise agreed by the parties in writing at the time of the custody decree, the custodian may determine the child's upbringing, including his education, health care, and *religious training*, unless the court after hearing finds, upon motion by the noncustodial parent, that in the absence of a specific limitation of the custodian's authority, the child's physical health would be endangered or his emotional development significantly impaired. (Emphasis added.)

Peggy contends that this statute authorizes her, not Terry or the court, to make decisions regarding the boys' religious training while they are in her custody. However, under the circumstances of this case, the boys' religious training is indistinct from the boys' basketball training, baseball training, or ski training, in the respect that whatever importance it may once have had to the parties and their children was completely overshadowed by its status as a fiercely contended scheduling issue. The parties' difficulty in coordinating, without intermittent and consistent strife, their schedules and the boys' schedules had reached a peak by the time the District Court was requested to resolve these matters. "[D]istrict courts have broad powers to determine all problems concerning custody and visitation." In re Marriage of Hunt (1994), 264 Mont. 159, 164, 870 P.2d 720, 723. Both parties have repeatedly sought judicial and other intervention into their daily lives in hopes of resolving their scheduling problems.

13

Peggy's claim now that the District Court is improperly interfering with her parental rights to raise her child as she wishes is completely disingenuous. The court attempted to resolve one aspect of the parties' custody and visitation problem by requiring the boys' attendance at "Sunday School and/or Church Services each Sunday that the custodial parent is not out of town." We do not agree with Peggy's first contention. The court did not err.

Peggy's second contention here is that the court's order requiring the boys' weekly attendance at the First Presbyterian Church in Bozeman violated her First Amendment religious rights. Peggy states that while Terry prefers the First Presbyterian Church, and while she used to attend that church, she no longer feels comfortable going there. Peggy argues that the court, in forcing the boys to attend "Terry's" church while they are in her custody, is in effect choosing between the parties' conflicting religious beliefs. Peggy cites a number of cases which indicate that courts are reluctant to get involved in conflicts regarding the religious training of children. *See, e.g.*, Munoz v. Munoz (1971), 79 Wash.2d 810, 489 P.2d 1133; Angel v. Angel (Ohio C.P. 1956), 140 N.E.2d 86; Khalsa v. Khalsa, 107 N.M. 31, 751 P.2d 715. However, the record does not reveal any conflict of religions between Terry and Peggy, only, again, a conflict regarding custody and visitation scheduling. The District Court did not violate Peggy's First Amendment religious rights by ordering the boys' church attendance at First Presbyterian.

14

ISSUE THREE

Did the District Court err in finding Peggy in contempt?

By order dated June 11, 1996, this Court granted Peggy's request to consolidate her appeal of the District Court's January 1996 orders finding her in contempt with her previously filed appeal of the court's December 1994 custody and visitation order. Also in that June 11, 1996 order, we stated that "[o]ur review of contempt orders in family law cases is limited to whether the district court acted within its jurisdiction and whether the evidence supports the contempt" (citing In re Marriage of Boyer (1995), 274 Mont. 282, 289, 908 P.2d 665, 669; In re Marriage of Dreesbach (1994), 265 Mont. 216, 224, 875 P.2d 1018, 1023; In re Marriage of Sullivan (1993), 258 Mont. 531, 539-40, 853 P.2d 1194, 1200). Terry and Peggy do not dispute the District Court's jurisdiction over the contempt matters. Therefore, the only issue here is whether the District Court's findings of contempt were supported by the evidence.

Peggy argues that the court's January 8, 1996 order finding her in contempt for failing to get the boys to sports practices and for failing to provide Terry with an IRS dependent exemption waiver form was not supported by the evidence. To the contrary, we conclude that the evidence supports the court's findings. The court states, at finding number 11:

The December 16, 1994 Order provides, in part:

"When the boys are with Petitioner, she shall insure that the boys attend the sports activities they participate in..."

At finding number 6, the court states:

> The parties' Separation, Custody and Property Settlement agreement provides in part:
>
>> "The parties agree that for 1990 and all years thereafter, each will claim one (1) of the children as dependents (Jesse by Husband and Jay by Wife) unless otherwise ordered by the Court and both parties agree to execute appropriate IRS forms to accomplish this."
>
> and this provision was incorporated into the original divorce decree.

Peggy does not dispute that she failed on various occasions in 1995 to get the boys to their respective sports activities. At the December 1995 hearing which preceded the court's January 8, 1996 order, Peggy offered explanations as to why she had not gotten the boys to their activities; Terry, in turn, testified to the effect that Peggy's explanations were not valid. With respect to this conflicting testimony, we note that a court may properly give more weight to one party's evidence than to the other party's evidence. *See*, In re the Marriage of Rolfe (1985), 216 Mont. 39, 44-45, 699 P.2d 79, 82. The court concluded that Peggy's failures to get the boys to their respective sports activities constituted violations of the December 16, 1994 order, and found Peggy in contempt. This finding of contempt is supported by the evidence.

With respect to the IRS form, Peggy's argument focuses mainly on the court's finding that Terry had suffered a penalty, levied by the IRS, as a result of her failure to give him the form before his taxes were due on April 15; she contends that finding was not supported by the evidence. This focus is misplaced. The court did

16

not need to find that Terry had suffered an adverse consequence as a result of Peggy's violation of the decree in order to find Peggy in contempt for violating the decree.

Peggy was required to annually provide Terry with a signed IRS form which would allow Terry to claim one of the children as a dependent on his tax forms. Peggy did not provide Terry the form by April 15, 1995, and in fact did not provide the form until requested to do so by the court at the September 28, 1995 contempt hearing. There was conflicting evidence presented concerning whether the form was available to Terry prior to April 15, 1995, but again, a court may properly give one party's evidence more weight than the other party's evidence. The court concluded that Peggy violated the dissolution decree by failing to provide Terry the IRS form in a timely manner, and found her in contempt. This finding of contempt is supported by the evidence.

Peggy also argues that the court erred by adopting, verbatim, Terry's proposed findings as its own. A court's verbatim adoption of proposed findings does not "constitute error per se." In re Marriage of Nikolaisen (1993), 257 Mont. 1, 5, 847 P.2d 287, 289. We set out the following test in Nikolaisen:

> When reviewing the adequacy of the findings of fact and conclusions of law, we examine whether they are sufficiently comprehensive and pertinent to provide a basis for a decision, and whether they are supported by substantial evidence.

Nikolaisen, 847 P.2d at 289 (citation omitted). The court's eleven pages of findings and conclusions regarding the parties' contempt motions are comprehensive, pertinent to the issues raised, and, as

17

we have already discussed, supported by substantial evidence. The court did not err in adopting verbatim Terry's proposed findings.

Affirmed.

_____
Justice

We Concur:

_____

_____

_____
Justices

December 19, 1996

## CERTIFICATE OF SERVICE

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:

Marcelle C. Quist
QUIST & BOWEN
1807 West Dickerson, Ste. D
Bozeman, MT 59715

Edmund P. Sedivy
SEDIVY, BENNETT & WHITE, P.C.
P.O. Box 1168
Bozeman, MT 59771-1168

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
Deputy